**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| NORTH METRO HARNESS INITIATIVE LLC d/b/a RUNNING ACES,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL BEATTIE; CRAIG BEAULIEU; RAYMOND BRENNY; SHELLEY BUCK; CONSTANCE CAMPBELL; MICHAEL CHILDS JR.; LEANA DEJESUS; IAN GORRIE; SCOTT HANSON; MICHAEL HEAVNER; ROXANNE HEMMING; MICHAEL JANKOVIAK; GRANT JOHNSON; JOHNNY JOHNSON; RONALD JOHNSON; DUSTIN GOSLIN; RYAN MCGRATH; KEVIN MCNAIR; VALENTINA MGENI; JOE NAYQUONABE, JR.; SHAWN O'KEEFE; LON ODONNELL; DAYNA PEARSON; ROBERT SAWYER; LES SCHMOLKE; RONDA WEIZENEGGER, all in their individual and official capacities,<br><br>Defendants. | Case No. _____ |

## COMPLAINT

Jesse Panuccio
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
954-356-0011

Hamish P.M. Hume
David M. Lehn
William J. Harvey
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
202-237-2727

Surya Saxena
Chad A. Blumenfield
GREENE ESPEL PLLP
222 S. 9th St., Suite 2200
Minneapolis, MN 55402
612-373-8331

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PARTIES ........................................................................................................... 3

JURISDICTION AND VENUE .......................................................................... 5

LEGAL BACKGROUND ................................................................................... 5

    I.     MINNESOTA GAMING LAW ................................................................. 5

    II.    FEDERAL INDIAN GAMING LAW .......................................................... 6

FACTUAL BACKGROUND ............................................................................... 7

    I.     THE GRAND CASINOS ....................................................................... 7

         A.    The MLCV Businesses ............................................................ 7

         B.    The Mille Lacs' Tribal-State Gaming Compacts ........................... 13

         C.    Illegal Gambling at Grand Casino Hinckley ................................ 15

         D.    Illegal Gambling at Grand Casino Mille Lacs .............................. 18

    II.    THE TREASURE ISLAND CASINO ...................................................... 21

         A.    The PI Businesses .................................................................. 21

         B.    The Prairie Island's Tribal-State Gaming Compacts ...................... 25

         C.    Illegal Gambling at Treasure Island Resort & Casino .................... 27

    III.   DEFENDANTS' ILLEGAL GAMING ACTIVITIES HAVE HARMED RUNNING ACES'
         BUSINESS ......................................................................................... 31

CLAIMS FOR RELIEF ................................................................................... 32

COUNT 1: Violations of 18 U.S.C. § 1962(c) with respect to MLCV and Grand Casinos  by
    every ML Gaming Leader, ML Finance Leader, and ML Marketing Leader in their
    individual capacity .................................................................................. 32

COUNT 2: Violations of 18 U.S.C. § 1962(d) based on conspiracy to violate 18 U.S.C.
    § 1962(c) with respect to MLCV and Grand Casinos by every ML Gaming Leader,
    ML Finance Leader, and ML Marketing Leader in their individual capacity ................. 36

COUNT 3: Violations of Minn. Stat. §§ 609.755, 609.76 subd. 1 by  every ML Gaming
    Leader, ML Finance Leader, and  ML Marketing Leader in their individual and

official capacities ........................................................................................................ 36

COUNT 4: Violations of 18 U.S.C. § 1962(c) with respect to PI Commercial Enterprises and Treasure Island Resort & Casino by every PI Gaming Leader,  PI Finance Leader, and PI Marketing Leader in their individual capacity ....................................................... 37

COUNT 5: Violations of 18 U.S.C. § 1962(d) based on conspiracy to violate 18 U.S.C. § 1962(c)  with respect to PI Commercial Enterprise and Treasure Island Resort & Casino by every PI Gaming Leader, PI Finance Leader, and  PI Marketing Leader in their individual capacity ............................................................................................. 40

PRAYER FOR RELIEF ............................................................................................... 41

North Metro Harness Initiative LLC d/b/a Running Aces ("Running Aces") alleges as follows.

## INTRODUCTION

1.      Running Aces operates a casino, racetrack, hotel, and live entertainment venue in Minnesota.  Its casino lawfully offers various common casino card games, such as blackjack, Three Card Poker, and Ultimate Texas Hold'Em.

2.      Running Aces is not one of the largest casinos in Minnesota.  Much larger are Grand Casino Hinckley and Grand Casino Mille Lacs, owned by the Mille Lacs Band of Ojibwe ("Mille Lacs"), and Treasure Island Resort & Casino, owned by the Prairie Island Indian Community ("Prairie Island").  These three casinos—defendants' casinos—generate hundreds of millions of dollars in gaming revenue annually on gaming floors that are multiple times bigger than Running Aces'.

3.      And defendants' casinos fight to preserve their dominance.  On one side, they have vigorously tried to block Running Aces' efforts to lawfully expand its gaming operations. For example, the Mille Lacs recently submitted a letter to the governor and the Minnesota Racing Commission ("MRC") opposing Running Aces' request to modestly expand its "dealer assist" table games.  On the other side, and in contrast to Running Aces' conscientious regard for the legal limitations on its gaming operations, defendants' casinos have vastly expanded their own gaming operations in blatant disregard of clear criminal prohibitions.

4.      Under the Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, any gaming on Indian lands within Minnesota is subject to Minnesota gaming law unless it is conducted consistent with IGRA's requirements.  IGRA specifies that class III gaming activities—such as casino card games—are "lawful on Indian lands *only if*" Minnesota "permits

1

such gaming for any purpose by any person" *and* such activities are "conducted in conformance" with a tribal-state gaming compact "that is in effect."

5.      Defendants' casinos have been conducting class III gaming activities—casino card games—without complying with IGRA and therefore in violation of Minnesota criminal law and federal law.

6.      The two Grand Casinos have been offering not only blackjack, consistent with the Mille Lacs' tribal-state gaming compacts, but also other class III card games, such as Three Card Poker and Ultimate Texas Hold'Em, which are not covered by their tribal-state gaming compacts.  The same was true of the Treasure Island Resort & Casino until October 2023, when the Prairie Island's gaming compact was amended to cover class III card games other than blackjack.  Minnesota criminal law prohibits class III card gaming except at a card room attached to a licensed parimutuel racetrack, which none of defendants' casinos has.  Therefore, by offering class III card games other than blackjack, these casinos have engaged in gaming that was not authorized by IGRA but instead violated Minnesota criminal law (at least until October 2023 for Treasure Island).

7.      These criminal gaming activities form the basis for defendants' violations of the federal Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§ 1961-1968, at issue here.  Defendants are individuals most responsible for the illegal gambling activities at their casinos.  They are or were the gaming, financing, and marketing leaders of their casinos. They have conducted, managed, supervised, directed, or financed the illegal gambling business at their casinos, in violation of 18 U.S.C. § 1955(a).  And they have intentionally promoted, managed, established, carried on, facilitated the promotion, management, establishment, or carrying on of, or distributed the proceeds of their casinos' illegal gambling activities through the

use of facilities in interstate commerce, in violation of 18 U.S.C. § 1952(a).  These violations of federal criminal law constitute RICO predicate acts under 18 U.S.C. § 1961(1).

8.      Through these RICO predicate acts, defendants have been conducting or participating in the affairs of various enterprises that have been engaged in, or whose activities have affected, interstate or foreign commerce—namely, the gaming and broader commercial enterprises of which defendants' casinos are a part—in violation of 18 U.S.C. § 1962(c). Defendants have also conspired to commit such acts in violation of 18 U.S.C. § 1962(d).

9.      Defendants' RICO violations have proximately harmed Running Aces' business. These RICO violations have given defendants' casinos illegal and unfair competitive advantages over Running Aces.  By offering class III card games other than blackjack, defendants' casinos have been able to attract many patrons who would otherwise have played card games at Running Aces, thereby depriving Running Aces of substantial revenue and profits—both from lost card gaming and from lost accompanying spending on food, lodging, and live entertainment.

10.     Therefore, Running Aces is entitled to treble damages for the harm to its business caused by defendants' illegal activities and an injunction against such illegal activities in the future.  Such relief is necessary to place defendants' casinos on a level and lawful playing field with Running Aces.

**PARTIES**

11.     Plaintiff North Metro Harness Initiative LLC d/b/a Running Aces is a business incorporated under the laws of the State of Minnesota.  Its principal place of business is in Columbus, Minnesota, where it owns and operates a casino, horse racetrack, and restaurant.

12.     Defendant Joe Nayquonabe, Jr., resides in or near Onomia, Minnesota.

13.     Defendant Leana DeJesus resides in or near Onamia, Minnesota.

14.     Defendant Michael Beattie resides in or near St. Paul, Minnesota.

3

15.     Defendant Ronda Weizenegger resides in or near Onamia, Minnesota.

16.     Defendant Lon Odonnell resides in or near Zimmerman, Minnesota.

17.     Defendant Raymond Brenny resides in or near Onamia, Minnesota.

18.     Defendant Robert Sawyer resides in or near Onamia, Minnesota.

19.     Defendant Scott Hanson resides in or near Onamia, Minnesota.

20.     Defendant Craig Beaulieu resides in or near Onamia, Minnesota.

21.     Defendant Les Schmolke resides in or near Hinckley, Minnesota.

22.     Defendant Shawn O'Keefe resides in or near San Leandro, California.

23.     Defendant Dustin Goslin resides in or near Onamia, Minnesota.

24.     Defendant Roxanne Hemming resides in or near Hinckley, Minnesota.

25.     Defendant Ryan McGrath resides in or near Minneapolis, Minnesota.

26.     Defendant Dayna Pearson resides in or near Baxter, Minnesota.

27.     Defendant Grant Johnson resides in or near Cottage Grove, Minnesota.

28.     Defendant Johnny Johnson resides in or near Welch, Minnesota.

29.     Defendant Ronald Johnson resides in or near Welch, Minnesota.

30.     Defendant Shelley Buck resides in St. Paul, Minnesota.

31.     Defendant Valentina Mgeni resides in or near Maplewood, Minnesota.

32.     Defendant Michael Childs Jr. resides in or near Welch, Minnesota.

33.     Defendant Constance Campbell resides in Red Wing, Minnesota.

34.     Defendant Michael Jankoviak resides in or near Welch, Minnesota.

35.     Defendant Ian Gorrie resides in Minnesota.

36.     Defendant Michael Heavner resides in or near Cottage Grove, Minnesota.

37.     Defendant Kevin McNair resides in Minnesota.

## JURISDICTION AND VENUE

38.     This case arises under the federal Racketeer Influenced and Corrupt Organization

("RICO") Act, 18 U.S.C. §§ 1961-1968.  This Court has subject-matter jurisdiction under 28

U.S.C. § 1331 and 18 U.S.C. § 1964.  The Court has supplemental subject-matter jurisdiction

over the state-law claims under 28 U.S.C. § 1367(a).

39.     Plaintiffs' requests for declaratory and injunctive relief are authorized by 28

U.S.C. §§ 2201-2202, RICO, Federal Rules of Civil Procedure 57 and 65, and the Court's

inherent powers.

40.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2)-(3) and 18 U.S.C.

§ 1965 because a substantial part of the events or omissions giving rise to the claims occurred

here, one or more defendants reside, are found, or transact their affairs here, and one or more

defendants are subject to personal jurisdiction here.

## LEGAL BACKGROUND

### I.     MINNESOTA GAMING LAW

41.     Under Minnesota law, "[l]awful gambling is the operation, conduct or sale of

bingo, raffles, paddlewheels, tipboards, and pull-tabs."  Minn. Stat. § 349.12 subd. 24.  All other

gambling is criminalized, with one exception discussed below.

42.     In particular, Minnesota law criminalizes: "mak[ing] a bet"; "permit[ting] a

structure or location … to be used as a gambling place," i.e., "a location or structure … wherein

… betting is permitted or promoted"; "maintain[ing] or operat[ing] a gambling place"; and

"intentionally participat[ing] in the income of a gambling place."  Minn. Stat. §§ 609.75 subd. 5,

609.755, 609.76 subd. 1.

43.     Under Minnesota law, a bet is "a bargain whereby the parties mutually agree to a

gain or loss by one to the other of specified money, property or benefit dependent upon chance

although the chance is accompanied by some element of skill."  Minn. Stat. § 609.75 subd. 1.

44.    Poker and casino card games, e.g., blackjack, Ultimate Texas Hold'Em, Mississippi Stud, Three Card Poker, Four Card Poker, Let It Ride, I Luv Suits Poker, and Pai Gow, involve betting and are therefore illegal in Minnesota.

45.    Minnesota law includes one exception to its general prohibition on gambling.  It allows a State-licensed person to operate parimutuel betting on horse racing at an authorized racetrack, and then allows such a person to also operate a card club at that racetrack wherein it may offer card games (card playing services) if conducted pursuant to a plan of operation approved by the Minnesota Racing Commission ("MRC").  Minn. Stat. §§ 240.30, 240.07 subd. 3(b); Minn. Stat. § 609.75 subd. 3(7).

## II.    FEDERAL INDIAN GAMING LAW

46.    Under federal law, "the criminal laws" of the State of Minnesota "have the same force and effect within … Indian country as they have elsewhere within the State."  18 U.S.C. § 1162(a).

47.    Further, under federal law, "all [Minnesota] laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, … apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State."  18 U.S.C. § 1166(a); *see also id.* § 1166(b).

48.    Federal law, however, exempts from Minnesota's otherwise-applicable gambling laws any gambling that is validly conducted on Indian lands pursuant to the Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*  18 U.S.C. § 1166(c).

49.    IGRA defines three classes of gaming and specifies different conditions under which each class is authorized on Indian lands.

50.    Class III includes "any banking card games" (a.k.a. "banked card games").  25

6

U.S.C. § 2703(7)(A)-(B), (8); 25 C.F.R. § 502.4.

51.    A banked card game is "any game of chance that is played with the house as a participant in the game, where the house takes on all players, collects from all losers, and pays all winners, and the house can win." 25 C.F.R. § 502.11.  The house, or bank, is ordinarily, but not necessarily, the casino.  As the National Indian Gaming Commission and tribal gaming regulatory authorities have recognized, any player in the game can serve as the bank, and thus "player banked card games are Class III games."

52.    Class III card games are generally the kinds of card games played at casinos, including blackjack (or "21"), baccarat, chemin de fer, Mississippi Stud, Three Card Poker, Four Card Poker, Let It Ride, and Ultimate Texas Hold'Em.  25 C.F.R. § 502.4(a)(1); *see* 25 U.S.C. § 2703(7)(B)(i).  Mississippi Stud, Three Card Poker, Four Card Poker, Let It Ride, and Ultimate Texas Hold'Em are banked variants of traditional poker, which is unbanked and may therefore be a class II game.  *See* 25 U.S.C. § 2703(7)(A)(ii).

53.    Under IGRA, "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are … [i] located in a State that permits such activities for any purpose by any person, organization, or entity, *and* … [ii] conducted in conformance with a Tribal-state gaming compact entered into by the Indian tribe and the State … that is in effect." 25 U.S.C. § 2710(d)(1).  A tribal-state gaming compact "take[s] effect only when notice of approval by the Secretary [of the Interior] of such compact has been published by the Secretary in the Federal Register." *Id.* § 2710(d)(3)(B).

## FACTUAL BACKGROUND

## I.    THE GRAND CASINOS

### A.    The MLCV Businesses

54.    The Mille Lacs is a band, or affiliate, of the Minnesota Chippewa, which is a

federally recognized tribe in Minnesota.

55.     The Mille Lacs' Corporate Commission oversees the Mille Lacs' business activities.  The Corporate Commission is led by the Commissioner of Corporate Affairs, who is advised by the Board of Directors.

56.     Joe Nayquonabe, Jr., has been the Mille Lacs' Commissioner of Corporate Affairs since 2012.

57.     The Mille Lacs' Corporate Commission conducts the Mille Lacs' business activities as Mille Lacs Corporate Ventures ("MLCV"), which operates like a holding company.

58.     MLCV is active in four lines of business: gaming, hospitality, government contracting, and investing in businesses on Mille Lacs tribal lands.  MLCV's business activities are conducted on and off tribal lands and are conducted in and substantially affect interstate or foreign commerce.

59.     MLCV's gaming line of business includes two Grand Casinos on tribal lands: Grand Casino Hinckley, in Hinckley, Minnesota, and Grand Casino Mille Lacs, in Vineland, Minnesota.  Both casinos opened in the early 1990s.  These casinos are two of the largest entertainment destinations in Minnesota.  Each casino operates 24 hours per day, seven days per week, year-round.  On information and belief, the two casinos host hundreds of thousands of customers annually and generate hundreds of millions of dollars in gambling revenue annually.

60.     Grand Casino Hinckley includes a 70,000-square foot casino, almost 900 rooms of lodgings (spread across a hotel, an inn, and chalets)—possibly the largest lodging complex in Minnesota—an RV park, several restaurants, and various entertainment options, including a golf course, an amphitheater, a spa, and an arcade.  Grand Casino Hinckley promotes itself as an "iconic venue" and "a cornerstone of live entertainment in the Midwest," where it hosts

nationally known touring entertainers.

61.  Grand Casino Mille Lacs includes a 70,000-square foot casino, a 494-room hotel, several restaurants, and various entertainment options, including a museum, a movie theater, and a concert venue.  Grand Casino Mille Lacs promotes itself as an "iconic venue" and "a cornerstone of live entertainment in the Midwest," where it hosts nationally known touring entertainers.

62.  Both Grand Casinos solicit and attract patrons for gaming, lodging, and entertainment from Minnesota, other States, and Canada.  MLCV presents the two casinos as "premier gaming and entertainment destinations in … the greater Midwest."  Each casino promotes itself extensively throughout the Midwest region and beyond, including on billboards, by direct mail to more than 100,000 people, and through advertisements in print, on television, and on various websites, including social media.  Correspondingly, each casino competes for gaming patrons with other casinos in Minnesota and in nearby States.

63.  Many people who are employed by or associated with MLCV or the Grand Casinos conduct, manage, supervise, direct, establish, carry on, and facilitate the management, establishment, and carrying on of MLCV's and Grand Casinos' gaming business activities at their casinos ("ML Gaming Leaders"), including:

a.  Joe Nayquonabe, Jr., MLCV, Chief Executive Officer and Chair of the Board (since 2012).  He is responsible for overseeing MLCV's business activities and identifying new business opportunities.

b.  Leana DeJesus, MLCV, director.  She is responsible for overseeing MLCV's business activities and identifying new business opportunities.

c.  Michael Beattie, MLCV, Chief Operating Officer (since 2023) and former

General Counsel (2014-2023). As the Chief Operating Officer, he is responsible for leading MLCV's strategy planning, execution and performance, and communications.

        d.     Ronda Weizenegger, Grand Casinos, Chief Executive Officer (since 2023) and former Chief Operating Officer (2017-2023), Chief Financial Officer (2014-2017), and General Manager (2003-2014). As Chief Executive Officer and Chief Operating Officer, she has overseen the MLCV casinos, including operations, strategy, marketing, and finance.

        e.     Lon Odonnell, Grand Casinos, Vice President of Gaming Strategy (since 2023) and Vice President of Gaming Operations (since 2022). He is responsible for shaping the gaming vision and strategic initiatives for the MLCV casinos. He leads efforts to optimize the casinos' gaming operations, elevate the player experience, and pinpoint growth prospects. He is responsible for crafting strategies that ensure the casinos remain competitive and innovative.

        f.     Raymond Brenny, Grand Casinos, Senior Vice President of Gaming Operations. He is responsible for developing budgets, coordinating with the operations team to achieve financial targets, and developing policy and strategy for MLCV's casinos and their gaming.

        g.     Robert Sawyer, Grand Casinos, Vice President of Gaming (2020-2021). He was responsible for MLCV's casinos' gaming operations.

        h.     Scott Hanson, Grand Casinos, Corporate Vice President of Table Games (since 2000). He is responsible for MLCV's casinos' table gaming operations.

        i.     Craig Beaulieu, Grand Casinos, Director of Gaming (since 2021). He is responsible for MLCV's casinos' gaming operations.

      j.     Les Schmolke, Table Games Manager (since 1992).  He is responsible for MLCV's casinos' table gaming operations.

64.    Many people who are employed by or associated with MLCV or the Grand Casinos finance, distribute the proceeds of, establish, and facilitate the promotion, management, establishment, and carrying on of MLCV's and Grand Casinos' gaming business activities at their casinos ("ML Finance Leaders"), including:

      a.     Joe Nayquonabe, Jr. (identified above).

      b.     Leana DeJesus (identified above).

      c.     Michael Beattie (identified above).

      d.     Ronda Weizenegger (identified above).

      e.     Shawn O'Keefe, MLCV, Chief Financial Officer (since 2019).  He is responsible for finance, treasury, accounting, compliance, resource allocation, financial and capital planning and analysis, M&A, business strategy, and financial direction to meet growth and investment objectives for MLCV's companies.

      f.     Dustin Goslin, MLCV, Vice President of Business and Economic Development (since 2019).  He is responsible for researching and analyzing potential businesses and investments for MLCV, and obtaining capital from a variety of public and private sources.

      g.     Roxanne Hemming, Grand Casinos, VP Finance and Chief Financial Officer (since 2009).  She is responsible for developing budgets, coordinating with the operations team to achieve financial targets, and developing policy and strategy for MLCV's casinos.

65.    Many people who are employed by or associated with MLCV or the Grand

Casinos promote and facilitate the promotion of MLCV's and Grand Casinos' gaming business activities at their casinos ("ML Marketing Leaders"), including:

  a.    Joe Nayquonabe, Jr. (identified above).

  b.    Leana DeJesus (identified above), Grand Casinos, Director of Entertainment and Promotions.  She is responsible for developing the casinos' promotional offers.

  c.    Michael Beattie (identified above).

  d.    Ronda Weizenegger (identified above).

  e.    Ryan McGrath, MLCV, Executive Vice President of Digital and Marketing Innovation (since 2022) and former Vice President of Digital Innovation (2021-2022).  He is responsible for developing and executing marketing campaigns for the MLCV casinos, with a focus on digital and technological marketing.

  f.    Dayna Pearson, Grand Casinos, Vice President of Marketing (since 2023) and former Director of Marketing (2020-2023).  She leads marketing in both traditional and digital media, including website operations, mobile applications, social media, and streaming for MLCV's casinos.  She is responsible for budget and spending decisions for marketing, and for developing market strategies for MLCV's casinos.

66.    The MLCV's Gaming Business also includes Slotco Capital, a firm whose mission is to improve slot-machine performance at tribal casinos around the country.  Slotco leases slot machines, supplies data-science resources, and makes capital investments in tribal casinos nationwide.

67.    MLCV's hospitality line of business includes three large hotels off tribal lands in the Twin Cities metro area of Minnesota: the InterContinental Saint Paul Riverfront, the

DoubleTree by Hilton Downtown Saint Paul, and the DoubleTree by Hilton Minneapolis-Park Place.  MLCV's hospitality line of business also includes the Embassy Suites Will Rogers Airport in Oklahoma City, Oklahoma, which is also off tribal lands.  And this line of business includes Maadaadizi Investments, which develops, acquires, and manages various hospitality properties, including in Minnesota and Oklahoma.

68.     MLCV's government-contracting business is conducted through Makwa Global. Makwa Global participates in the Small Business Administration's 8(a) contracting program and competes for federal contracts in several sectors, including security, information technology, professional services and staffing, logistics and procurement, and construction.  Makwa Global, as its name indicates, has operations around the country (including in Minnesota, Virginia, Arizona, and Hawaii) and abroad (in Germany, the United Arab Emirates, and Kenya).

69.     On information and belief, MLCV and Grand Casinos invest the proceeds from their the casinos' gaming activities into the Grand Casinos, including the casinos and associated hotels, restaurants, and entertainment venues, as well as into MLCV's other businesses, including its hotels in Minnesota and Oklahoma, i.e., the InterContinental Saint Paul Riverfront, the DoubleTree by Hilton Downtown Saint Paul, the DoubleTree by Hilton Minneapolis-Park Place, and the Embassy Suites Will Rogers Airport.

**B.     The Mille Lacs' Tribal-State Gaming Compacts**

70.     The Mille Lacs has entered into two tribal-state gaming compacts purportedly allowing certain class III gaming activities on tribal lands.

71.     In 1990, the Mille Lacs and the State of Minnesota entered into a tribal-state gaming compact to allow the Mille Lacs to operate "video games of chance within the Reservation" ("ML Video Game Compact," attached as Ex. 1).  The Secretary of the Interior approved and published the ML Video Game Compact shortly thereafter.

13

72.     The ML Video Game Compact defines "video games of chance" as "electronic or electromechanical video devices that simulate games commonly referred to as poker, blackjack, craps, hi-lo, roulette, line-up symbols and numbers, or other common gambling forms, which are activated by the insertion of a coin, token, or currency, and which award game credits, cash, tokens, or replays, and contain a meter or device to record unplayed credits or replays."

73.     In 1991, the Mille Lacs and the State of Minnesota entered into another tribal-state gaming compact to allow the Mille Lacs to offer the class III card game blackjack (or 21) "within the Reservation" ("ML Blackjack Compact," attached as Ex. 2).  The Secretary of the Interior approved and published the ML Blackjack Compact shortly thereafter.

74.     The ML Blackjack Compact defines "blackjack" as "a banking card game which involves the use of one or more decks of playing cards, the purpose of which is to reach the number '21' (or as close thereto as possible without exceeding the number '21') through the cumulative addition of cards dealt to the players and the house."

75.     There have never been any other approved tribal-state gaming compacts in effect between the Mille Lacs and the State of Minnesota, and no other class III games have been covered by the tribal-state gaming compacts in effect between the Mille Lacs and the State of Minnesota.

76.     The Mille Lacs and the State of Minnesota agreed to amend the ML Blackjack Compact to allow limited forms of side bets on August 26, 2021, and agreed to amend that compact to allow additional forms of side bets on May 2, 2023.  But neither amendment has been published in the Federal Register and therefore neither has ever taken effect.  *See* 25 C.F.R. §§ 293.4 & 293.15.

77.     Pursuant to IGRA, in 1995 the Mille Lacs adopted a gaming ordinance.  The

14

Mille Lacs amended the ordinance in 2003.

78.     As amended, the ordinance established the Mille Lacs Gaming Regulatory Authority to oversee and enforce gaming regulatory matters under Mille Lacs law.  The ordinance grants the Gaming Regulatory Authority the power and duty to promulgate regulations regarding tribal gaming, to issue gaming licenses, and to ensure compliance with applicable laws, including IGRA and the tribal-state gaming compacts.

79.     As amended, the ordinance also states that "Class III Games" are "permitted" only if "licensed and conducted under the terms of" a gaming compact between the Mille Lacs and the State of Minnesota.

80.     As amended, the ordinance defines Grand Casino Hinckley and Grand Casino Mille Lacs as separate "Gaming Enterprises" and requires that each casino be licensed separately and states that the Gaming Regulatory Authority must "issue a separate license to each place, facility, or location on Band Lands where the Band elects to allow class II or class III gaming." On information and belief, the Gaming Regulatory Authority issued separate licenses to Grand Casino Hinckley and Grand Casino Mille Lacs to conduct class III gaming.

### C.     Illegal Gambling at Grand Casino Hinckley

81.     Since 2020, Grand Casino Hinckley has continuously offered various class III card games.  Grand Casino Hinckley has offered blackjack, in conformance with the Mille Lacs tribal-state gaming compacts.  But the casino has also continuously offered various class III card games that have never been authorized by the Mille Lacs tribal-state gaming compacts, including side bets on blackjack (e.g., TriLux Bonus, Fortune Blackjack, Blazing 7s Four-Tier Progressive), Mississippi Stud, Three Card Poker, Let It Ride, and Ultimate Texas Hold'Em. The casino has not offered those games pursuant to a plan of operation approved by the MRC in connection with parimutuel horse racing.

82.     Therefore, the casino's offering of those non-compact class III card games has been illegal: the casino's card games involve making bets, the casino is a gambling place, and the casino's operations involve permitting a structure or location to be used as a gambling place, maintaining or operating a gambling place, and intentionally participating in the income of a gambling place—all in violation of Minn. Stat. §§ 609.755, 609.76 subd. 1, and 18 U.S.C. §§ 1162(a), 1166(a).

83.     Grand Casino Hinckley has promoted its illegal class III gaming activities through the mail or facilities in interstate commerce.  For example, its website states that it offers "Ultimate Texas Hold'em, Mississippi Stud, Let it Ride, and Three Card Poker," and various "Side bets."  And as described above, it advertises throughout the Midwest region and beyond through direct mail, on television, and on the internet.

84.     Grand Casino Hinckley obtains gaming equipment and other materials from suppliers in other States.  For example, it licenses many of its non-compact class III games— including Three Card Poker, Let It Ride, and Ultimate Texas Hold'Em—from SHFL Entertainment, Inc., a Nevada-based subsidiary of Light & Wonder, Inc., itself a Nevada-based company.

85.     Since 2020, Grand Casino Hinckley has operated as an illegal gambling business under 18 U.S.C. § 1955(b).  Specifically:

a.      Grand Casino Hinckley is a gambling business.

b.      By offering non-compact class III gaming, Grand Casino Hinckley's gambling business has been continuously violating Minnesota criminal law in multiple ways.  The casino has made bets.  The casino has maintained, operated, and permitted its structure or location to be used as a gambling place.  And the casino has intentionally

16

participated in the income of a gambling place.  *See* Minn. Stat. §§ 609.75, 609.755, 609.76; Minn. Stat. §§ 349.12, 349.13.

       c.     Grand Casino Hinckley's gambling business has involved five or more persons who conduct, finance, manage, supervise, or direct all or part of such business, including all the ML Gaming Leaders and ML Finance Leaders.

       d.     Grand Casino Hinckley's gambling business has continuously offered these illegal gaming activities for more than 30 days.

       e.     On information and belief, Grand Casino Hinckley's gambling business has had gross revenue of $2,000 or more on single days.

86.     In violation of 18 U.S.C. § 1955(a), each ML Gaming Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually conducted, managed, supervised, and directed all or part of Grand Casino Hinckley's illegal gambling business.

87.     In violation of 18 U.S.C. § 1955(a), each ML Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually financed all or part of Grand Casino Hinckley's illegal gambling business.

88.     In violation of 18 U.S.C. § 1952(a), each ML Gaming Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to manage, establish, carry on, or facilitate the management, establishment, or carrying on of unlawful activity, namely, Grand Casino Hinckley's illegal gaming activities, and thereafter did or attempted to manage, establish, carry on, or facilitate the management, establishment, or carrying on of such activity.

89.     In violation of 18 U.S.C. § 1952(a), each ML Finance Leader, pursuant to their

employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to promote, establish, carry on or facilitate the promotion, management, establishment, or carrying on of unlawful activity, namely, Grand Casino Hinckley's illegal gaming activities, and thereafter did or attempted to establish or facilitate the promotion, management, establishment, or carrying on of such activity.

90.     In violation of 18 U.S.C. § 1952(a), each ML Marketing Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to promote or facilitate the promotion of unlawful activity, namely, Grand Casino Hinckley's illegal gaming activities, and thereafter did or attempted to promote or facilitate the promotion of such activity.

91.     In violation of 18 U.S.C. § 1952(a), each ML Gaming Leader and ML Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to distribute the proceeds of an unlawful activity, namely, Grand Casino Hinckley's illegal gaming activities, and thereafter did or attempted to distribute such proceeds.

**D.      Illegal Gambling at Grand Casino Mille Lacs**

92.     Since 2020, Grand Casino Mille Lacs has continuously offered various class III card games.  Grand Casino Mille Lacs has offered blackjack, in conformance with the Mille Lacs tribal-state gaming compacts.  But the casino has also continuously offered various class III card games that have never been authorized by the Mille Lacs tribal-state gaming compacts, including side bets on blackjack (e.g., TriLux Bonus, Fortune Blackjack, Blazing 7s Four-Tier

Progressive), Mississippi Stud, Three Card Poker, Four Card Poker, Let It Ride, and Ultimate
Texas Hold'Em.  The casino has not offered those games pursuant to a plan of operation
approved by the MRC in connection with parimutuel horse racing.

93.     Therefore, the casino's offering of those non-compact class III card games has
been illegal: the casino's card games involve making bets, the casino is a gambling place, and the
casino's operations involve permitting a structure or location to be used as a gambling place,
maintaining or operating a gambling place, and intentionally participating in the income of a
gambling place—all in violation of Minn. Stat. §§ 609.755, 609.76 subd. 1, and 18 U.S.C.
§§ 1162(a), 1166(a).

94.     Grand Casino Mille Lacs has promoted its illegal class III gaming activities
through the mail or facilities in interstate commerce.  For example, its website states that it offers
"Ultimate Texas Hold'em, Three Card Poker, Mississippi Stud, and Four Card Poker," and
various "Side bets" on blackjack.  And as described above, it advertises throughout the Midwest
region and beyond through direct mail, on television, and on the internet.

95.     Grand Casino Mille Lacs obtains gaming equipment and other materials from
suppliers in other States.  For example, it licenses many of its non-compact class III games—
including Ultimate Texas Hold'Em Three Card Poker, Mississippi Stud, and Four Card Poker—
from Light & Wonder, a Nevada-based corporation.

96.     Since 2020, Grand Casino Mille Lacs has operated as an illegal gambling
business under 18 U.S.C. § 1955(b).  Specifically:

       a.       Grand Casino Mille Lacs is a gambling business.

       b.       By offering non-compact class III gaming, Grand Casino Mille Lacs'
gambling business has been continuously violating Minnesota criminal law in multiple

19

ways.  The casino has made bets.  The casino has maintained, operated, and permitted its structure or location to be used as a gambling place.  And the casino has intentionally participated in the income of a gambling place.  *See* Minn. Stat. §§ 609.75, 609.755, 609.76; Minn. Stat. §§ 349.12, 349.13.

      c.     Grand Casino Mille Lacs' gambling business has involved five or more persons who conduct, finance, manage, supervise, or direct all or part of such business, including all the ML Gaming Leaders and ML Finance Leaders.

      d.     Grand Casino Mille Lacs' gambling business has continuously offered these illegal gaming activities for more than 30 days.

      e.     On information and belief, Grand Casino Mille Lacs' gambling business has had gross revenue of $2,000 or more on single days.

97.     In violation of 18 U.S.C. § 1955(a), each ML Gaming Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually conducted, managed, supervised, and directed all or part of Grand Casino Mille Lacs' illegal gambling business.

98.     In violation of 18 U.S.C. § 1955(a), each ML Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually financed all or part of Grand Casino Mille Lacs' illegal gambling business.

99.     In violation of 18 U.S.C. § 1952(a), each ML Gaming Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to manage, establish, carry on, or facilitate the management, establishment, or carrying on of unlawful activity, namely, Grand Casino Mille Lacs' illegal gaming activities, and thereafter did or attempted to manage, establish, carry on, or facilitate the management,

establishment, or carrying on of such activity.

100.     In violation of 18 U.S.C. § 1952(a), each ML Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to promote, establish, carry on or facilitate the promotion, management, establishment, or carrying on of unlawful activity, namely, Grand Casino Mille Lacs' illegal gaming activities, and thereafter did or attempted to establish or facilitate the promotion, management, establishment, or carrying on of such activity.

101.     In violation of 18 U.S.C. § 1952(a), each ML Marketing Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to promote or facilitate the promotion of unlawful activity, namely, Grand Casino Mille Lacs' illegal gaming activities, and thereafter did or attempted to promote or facilitate the promotion of such activity.

102.     In violation of 18 U.S.C. § 1952(a), each ML Gaming Leader and ML Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to distribute the proceeds of an unlawful activity, namely, Grand Casino Mille Lacs' illegal gaming activities, and thereafter did or attempted to distribute such proceeds.

## II.     THE TREASURE ISLAND CASINO

### A.     The PI Businesses

103.     Prairie Island is a federally recognized Indian tribe in Minnesota.

104.     The Prairie Island Community Council, also known as the Tribal Council, is

responsible for running the tribe's businesses ("PI Commercial Enterprises"), including overseeing the tribe's business strategy, financing, and operations.

105.     PI Commercial Enterprises is a major commercial operation encompassing Treasure Island Resort & Casino, an assisted-living center, the Mt. Frontenac Golf Course, and a gas station, all in or near Welch, Minnesota.  PI Commercial Enterprises' business activities substantially affect interstate or foreign commerce.

106.     Treasure Island Resort & Casino opened in 1991 on the banks of the Mississippi River.  It operates 24 hours per day, seven days per week, year-round.  It has a 116,000-square foot casino—the second largest in Minnesota—with dozens of gaming tables.  Treasure Island Resort & Casino also includes the second-largest hotel in Minnesota (with 788 rooms), several restaurants and bars, a water park, a spa, a 2800-seat event and convention center, a 10,000-seat amphitheater, a 137-slip marina, a 95-spot RV park, a 125-passenger cruise yacht, a 24-lane bowling alley, and an arcade.  The venue attracts nationally known touring entertainers, such as Carrie Underwood, Dwight Yoakam, and Jason Aldean.

107.     On information and belief, Treasure Island Resort & Casino hosts hundreds of thousands of customers annually and generates hundreds of millions of dollars in gaming revenue annually.

108.     Treasure Island Resort & Casino solicits and attracts gaming patrons for gaming, lodging, and entertainment from Minnesota, other States, and Canada.  It promotes itself extensively in other States, including in print magazines distributed primarily in other States and in online travel magazines.  Correspondingly, it competes for gaming patrons with other casinos in Minnesota and in nearby States.

109.     Many people who are employed by or associated with PI Commercial Enterprises

or Treasure Island Resort & Casino conduct, manage, supervise, direct, establish, carry on, and facilitate the management, establishment, and carrying on of PI Commercial Enterprises' and Treasure Island Resort & Casino's gaming business activities at their casino ("PI Gaming Leaders"), including:

110.    Grant Johnson, Prairie Island Tribal Council, President.  He is responsible for business strategy, financing, and operations at Treasure Island Resort & Casino.

111.    Johnny Johnson, Prairie Island Tribal Council, former President and council member (around 1995-2023).  He was responsible for business strategy, financing, and operations at Treasure Island Resort & Casino.

112.    Ronald Johnson, Prairie Island Tribal Council, Vice President.  He is responsible for business strategy, financing, and operations at Treasure Island Resort & Casino.

113.    Shelley Buck, Prairie Island Tribal Council, former President, Vice President, and Secretary (2013-2023).  She was responsible for business strategy, financing, and operations at Treasure Island Resort & Casino.

114.    Valentina Mgeni, Prairie Island Tribal Council, Secretary (since about 2019).  She is responsible for business strategy, financing, and operations at Treasure Island Resort & Casino.

115.    Michael Childs Jr., Prairie Island Tribal Council, Treasurer (since about 2019).  He is responsible for business strategy, financing, and operations at Treasure Island Resort & Casino.

116.    Constance Campbell, Prairie Island Tribal Council, Assistant Secretary/Treasurer (since 2023).  She is responsible for business strategy, financing, and

operations at Treasure Island Resort & Casino.

117.    Michael Jankoviak, Treasure Island Resort & Casino, Director of Casino Operations (since 2019) and former Interim General Manager and Director of Slot Operations.  He is responsible for overseeing the casino's day-to-day operations and the casino's strategic planning.

118.    Many people who are employed by or associated with PI Commercial Enterprises or Treasure Island Resort & Casino finance, distribute the proceeds of, establish, and facilitate the promotion, management, establishment, and carrying on of PI Commercial Enterprises' and Treasure Island Resort & Casino's gaming business activities at their casino ("PI Island Finance Leaders"), including:

   a.    Grant Johnson (identified above).

   b.    Johnny Johnson (identified above).

   c.    Ronald Johnson (identified above).

   d.    Shelley Buck (identified above).

   e.    Valentina Mgeni (identified above).

   f.    Michael Childs Jr. (identified above).

   g.    Constance Campbell (identified above).

   h.    Michael Jankoviak (identified above).

   i.    Ian Gorrie, Treasure Island Resort & Casino, Chief Financial Officer.  He is responsible for developing budgets, coordinating with the operations team to achieve financial targets, and developing policy and strategy for Treasure Island Resort & Casino.

   j.    Mike Heavner, Treasure Island Resort & Casino, Director of Finance (since 2014).  He is responsible for managing the casino's finances, including budgeting and

forecasting.

119.    Many people who are employed by or associated with PI Commercial Enterprises or Treasure Island Resort & Casino promote and facilitate the promotion of PI Commercial Enterprises' and Treasure Island Resort & Casino's gaming business activities at their casino ("PI Marketing Leaders"), including:

      a.    Grant Johnson (identified above).

      b.    Johnny Johnson (identified above).

      c.    Ronald Johnson (identified above).

      d.    Shelley Buck (identified above).

      e.    Valentina Mgeni (identified above).

      f.    Michael Childs Jr. (identified above).

      g.    Constance Campbell (identified above).

      h.    Michael Jankoviak (identified above).

      i.    Kevin McNair, Treasure Island Resort & Casino, Casino Marketing Director.  He is responsible for developing, managing, and strategically planning marketing campaigns for the casino at Treasure Island Resort & Casino.

120.    On information and belief, PI Commercial Enterprises and Treasure Island Resort & Casino invest the proceeds from their casino's gaming activities into their various business ventures, including the casinos and associated hotel, restaurants, and entertainment ventures.

**B.    The Prairie Island's Tribal-State Gaming Compacts**

121.    The Prairie Island has entered into two tribal-state gaming compacts purportedly allowing certain class III gaming activities on tribal lands.

122.    In 1990, the Prairie Island and the State of Minnesota entered into a tribal-state gaming compact to allow the Prairie Island to operate "video games of chance within the

25

Reservation" ("PI Video Game Compact," attached as Ex. 3).  The Secretary of the Interior approved and published the PI Video Game Compact shortly thereafter.

123.    The PI Video Game Compact defines "video games of chance" as "electronic or electromechanical video devices that simulate games commonly referred to as poker, blackjack, craps, hi-lo, roulette, line-up symbols and numbers, or other common gambling forms, which are activated by the insertion of a coin, token, or currency, and which award game credits, cash, tokens, or replays, and contain a meter or device to record unplayed credits or replays."

124.    In 1991, the Prairie Island and the State of Minnesota entered into another tribal-state gaming compact to allow the Prairie Island to offer the class III card game blackjack (or 21) "within the Reservation" ("PI Blackjack Compact," attached as Ex. 5).  The Secretary of the Interior approved and published the PI Blackjack Compact shortly thereafter.  Technical amendments were made to the PI Blackjack Compact in 1991 (attached as Ex. 4).

125.    The PI Blackjack Compact defines "blackjack" as "a banking card game which involves the use of one or more decks of playing cards, the purpose of which is to reach the number '21' (or as close thereto as possible without exceeding the number '21') through the cumulative addition of cards dealt to the players and the house."

126.    There have never been any other approved tribal-state gaming compacts between the Prairie Island and the State of Minnesota in effect.

127.    Until October 4, 2023, no tribal-state gaming compact between the Prairie Island and the State of Minnesota covered any other class III games.

128.    On October 4, 2023, however, the Department of the Interior published notice in the Federal Register of its approval of an amendment to the PI Blackjack Compact that "permits … the operation of Class III card games" within the Prairie Island reservation.  The compact

defines "Class III Card Game" to mean "any Banking Card Game, including dealer controlled or dealer assisted electronic games," other than blackjack (attached as Ex. 6).

129.    The Prairie Island and the State of Minnesota agreed to amend the PI Blackjack Compact to allow limited forms of side bets on January 5, 2022, but that amendment has not been published in the Federal Register and therefore has never taken effect.  *See* 25 C.F.R. §§ 293.4 & 293.15.

130.    Pursuant to IGRA, in 1994 the Prairie Island adopted a gaming ordinance.  The Prairie Island amended the ordinance several times, most recently in 2010.

131.    As amended, the ordinance established the Prairie Island Gaming Commission to oversee and enforce gaming regulatory matters under Prairie Island law.  The ordinance grants the Gaming Commission the power and duty to promulgate regulations regarding tribal gaming, to issue gaming licenses, and to ensure compliance with applicable laws, including IGRA and the tribal-state gaming compacts.

132.    As amended, the ordinance requires that each "Gaming Facility"—which is "any location … wherein Gaming is permitted and Gaming Operations are conducted"—be licensed by the Gaming Commission.  On information and believe, the Gaming Commission issued a license to the Treasure Island Resort & Casino.

## C.    Illegal Gambling at Treasure Island Resort & Casino

133.    Since 2020, Treasure Island Resort & Casino has continuously offered various class III card games.  Treasure Island has offered blackjack, in conformance with the Prairie Island tribal-state gaming compacts.  But the casino has also continuously offered various other class III card games, including side bets on blackjack (e.g., Trilux, Fortune Blackjack, Blazing 7s Progressive), baccarat, Free Bet Blackjack, Mississippi Stud, Ultimate Texas Hold'em, Three Card Poker, Four Card Poker, I Luv Suits Poker, Let It Ride, and Pai Gow.  Those games were

27

not authorized by the Prairie Island tribal-state gaming compacts until October 4, 2023, when the Secretary published an approved amendment to the Prairie Island Blackjack Compact.  At no time did the casino offer those non-compact games pursuant to a plan of operation approved by the MRC in connection with parimutuel horse racing.

134.    Therefore, the casino's offering of those non-compact class III card games was illegal (until October 4, 2023): the casino's card games involve making bets, the casino is a gambling place, and the casino's operations involve permitting a structure or location to be used as a gambling place, maintaining or operating a gambling place, and intentionally participating in the income of a gambling place—all in violation of Minn. Stat. §§ 609.755, 609.76 subd. 1, and 18 U.S.C. §§ 1162(a), 1166(a).

135.    Treasure Island Resort & Casino has promoted its illegal class III gaming activities through the mail or facilities in interstate commerce.  For example, its website highlights "Table Games" and lists each type of those games offered, as well as types of side bets.  And as described above, it advertises throughout in other States through the mail and on the internet.

136.    Treasure Island Resort & Casino obtains gaming equipment and other materials from suppliers in other States.  For example, it licenses some of its non-blackjack class III gaming—including Ultimate Texas Hold'Em, Three Card Poker, Mississippi Stud, and Four Card Poker—from SHFL Entertainment, a Nevada-based corporation.

137.    Since 2020, Treasure Island Resort & Casino has operated as an illegal gambling business under 18 U.S.C. § 1955(b).  Specifically:

      a.    Treasure Island Resort & Casino is a gambling business.

      b.    By offering non-compact class III gaming (before October 4, 2023),

Treasure Island Resort & Casino's gambling business has been continuously violating Minnesota criminal law in multiple ways.  The casino has made bets.  The casino has maintained, operated, and permitted its structure or location to be used as a gambling place.  And the casino has intentionally participated in the income of a gambling place. *See* Minn. Stat. §§ 609.75, 609.755, 609.76; Minn. Stat. §§ 349.12, 349.13.

c.     Treasure Island Resort & Casino's gambling business has involved five or more persons who conduct, finance, manage, supervise, or direct all or part of such business, including all the PI Gaming Leaders and PI Finance Leaders.

d.     Treasure Island Resort & Casino's gambling business has continuously offered these illegal gaming activities for more than 30 days.

e.     On information and belief, Treasure Island Resort & Casino's gambling business has had gross revenue of $2,000 or more on single days.

138.    In violation of 18 U.S.C. § 1955(a), each PI Gaming Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually conducted, managed, supervised, and directed all or part of Treasure Island Resort & Casino's illegal gambling business.

139.    In violation of 18 U.S.C. § 1955(a), each PI Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually financed all or part of Treasure Island Resort & Casino's illegal gambling business.

140.    In violation of 18 U.S.C. § 1952(a), each PI Gaming Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to manage, establish, carry on, or facilitate the management, establishment, or

29

carrying on of unlawful activity, namely, Treasure Island Resort & Casino's illegal gaming activities, and thereafter did or attempted to manage, establish, carry on, or facilitate the management, establishment, or carrying on of such activity.

141. In violation of 18 U.S.C. § 1952(a), each PI Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks— with intent to promote, establish, carry on or facilitate the promotion, management, establishment, or carrying on of unlawful activity, namely, Treasure Island Resort & Casino's illegal gaming activities, and thereafter did or attempted to establish or facilitate the promotion, management, establishment, or carrying on of such activity.

142. In violation of 18 U.S.C. § 1952(a), each PI Marketing Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks— with intent to promote or facilitate the promotion of unlawful activity, namely, Treasure Island Resort & Casino's illegal gaming activities, and thereafter did or attempted to promote or facilitate the promotion of such activity.

143. In violation of 18 U.S.C. § 1952(a), each PI Gaming Leader and PI Finance Leader, pursuant to their employment responsibilities during their tenure since 2020, has continually used the mail or a facility in interstate or foreign commerce—including the internet and cellular phone networks—with intent to distribute the proceeds of an unlawful activity, namely, Treasure Island Resort & Casino's illegal gaming activities, and thereafter did or attempted to distribute such proceeds.

III.   **DEFENDANTS' ILLEGAL GAMING ACTIVITIES HAVE HARMED RUNNING ACES' BUSINESS**

144.   Since 2008, Running Aces has operated a 10,000-square foot casino, a racetrack, and a restaurant (and associated food and beverage service) in Columbus, Minnesota, consistent with Minnesota law.

145.   Running Aces hosts live parimutuel betting on horse racing on its racetrack.

146.   Pursuant to a plan of operation approved by the MRC and consistent with Minnesota law, Running Aces' casino hosts a card club, where poker and various class III card games are played, including blackjack, side bets on blackjack, Mississippi Stud, Three Card Poker, Four Card Poker, and Ultimate Texas Hold'Em.  Running Aces has continuously offered class III card games since 2020.

147.   Running Aces' patrons typically play casino card games, bet on horse races, and enjoy meals and snacks on the premises.

148.   Because of their geographic proximity, Running Aces competes for gaming patrons with Grand Casino Hinckley, Grand Casino Mille Lacs, and Treasure Island Resort & Casino.

149.   The illegal gambling activities at Grand Casino Hinckley, Grand Casino Mille Lacs, and Treasure Island Resort & Casino have harmed Running Aces financially.  Those casinos have used their illegal class III card games to offer an overlapping and broader set of gaming options than Running Aces was legally permitted to offer.  If those casinos did not illegally offer class III card games, anyone considering playing class III card games other than blackjack in the area would not have patronized those casinos but instead would likely have patronized Running Aces.

150.   In short, the illegal gambling activities at Grand Casino Hinckley, Grand Casino

Mille Lacs, and Treasure Island Resort & Casino gave those casinos an illegal and unfair competitive advantage against Running Aces.

151.    As a result, defendants' conduct relating to the illegal gambling activities at Grand Casino Hinckley, Grand Casino Mille Lacs, and Treasure Island Resort & Casino deprived Running Aces of substantial sums of business revenue and profit.  That conduct directly deprived Running Aces of gaming patrons it would have otherwise served, and thus deprived Running Aces of the profits it would have otherwise earned from those patrons through casino card games, as well as through ancillary activities horse racing and food and beverages.

### CLAIMS FOR RELIEF

#### COUNT 1:
**Violations of 18 U.S.C. § 1962(c) with respect to MLCV and Grand Casinos
by every ML Gaming Leader, ML Finance Leader, and ML Marketing
<u>Leader in their individual capacity</u>**

152.    Each ML Gaming Leader, ML Finance Leader, and ML Marketing Leader has violated 18 U.S.C. § 1962(c) with respect to MLCV and Grand Casinos.

153.    MLCV is an enterprise for RICO purposes: it is a company engaged in several lines of business, including gaming.

154.    Grand Casinos is an enterprise for RICO purposes: it is either a company or a long-established, ongoing organization functioning as an integrated unit for the overt purpose of furthering MLCV's gaming business.

155.    MLCV and Grand Casinos are engaged in, and their activities affect, interstate or foreign commerce.  For example:

    a.    MLCV owns and operates numerous large hotels in multiple States: Grand
    Casino Hinckley, which may be the largest lodging complex in Minnesota; Grand Casino
    Mille Lacs; the InterContinental Saint Paul Riverfront; the DoubleTree by Hilton

Downtown Saint Paul; the DoubleTree by Hilton Minneapolis-Park Place; and the Embassy Suites Will Rogers Airport, in Oklahoma. These hotels solicit and attract interstate and foreign travelers.

       b.    MLCV owns and operates an investment firm with operations in multiple States: Maadaadizi Investments.

       c.    MLCV owns a government-contracting company with operations in multiple States and abroad: Makwa Global.

       d.    MLCV and Grand Casinos own and operate two of the largest casinos and resorts in Minnesota: Grand Casino Hinckley and Grand Casino Mille Lacs. Each casino solicits and attracts interstate and foreign patrons, competes with casinos in other States, and obtains gaming supplies from other States.

       e.    MLCV owns and operates a gaming company that supports casinos around the country: Slotco Capital.

       f.    MLCV's gaming business and Grand Casinos are operated by ML Gaming Leaders, ML Finance Leaders, and ML Marketing Leaders through the use of interstate wires, including the internet and cellular phone networks.

156.    Each ML Gaming Leader, ML Finance Leaders, and ML Marketing Leader is employed by or associated with MLCV and Grand Casinos. By virtue of their related responsibilities, each ML Gaming Leader, ML Finance Leaders, and ML Marketing Leader has conducted or participated in the conduct of MLCV's and Grand Casinos' affairs through at least two acts of racketeering within the last ten years that are related to each other and to MLCV's gambling business and to Grand Casinos:

       a.    Conducting, managing, supervising, or directing all or part of the illegal

gambling business at Grand Casino Hinckley (relating to its non-compact class III gaming) in violation of 18 U.S.C. § 1955(a);

       b.      Conducting, managing, supervising, or directing all or part of the illegal gambling business at Grand Casino Mille Lacs (relating to its non-compact class III gaming) in violation of 18 U.S.C. § 1955(a);

       c.      Financing all or part of the illegal gambling business at Grand Casino Hinckley (relating to its non-compact class III gaming) in violation of 18 U.S.C. § 1955(a);

       d.      Financing all or part of the illegal gambling business at Grand Casino Mille Lacs (relating to its non-compact class III gaming) in violation of 18 U.S.C. § 1955(a);

       e.      Using the mail or a facility in interstate or foreign commerce, including the internet and cellular phone networks, with intent to manage, establish, carry on, or facilitate the management, establishment, or carrying on of unlawful activity, namely, non-compact class III gaming at Grand Casino Hinckley, and thereafter did or attempted to manage, establish, carry on, or facilitate the management, establishment, or carrying on of such activity, in violation of 18 U.S.C. § 1952(a)(3) & (A).

       f.      Using the mail or a facility in interstate or foreign commerce, including the internet and cellular phone networks, with intent to manage, establish, carry on, or facilitate the management, establishment, or carrying on of unlawful activity, namely, non-compact class III gaming at Grand Casino Mille Lacs, and thereafter did or attempted to manage, establish, carry on, or facilitate the management, establishment, or carrying on of such activity, in violation of 18 U.S.C. § 1952(a)(3) & (A).

g.      Using the mail or a facility in interstate or foreign commerce, including the internet and cellular phone networks, with intent to promote or facilitate the promotion of unlawful activity, namely, non-compact class III gaming at Grand Casino Hinckley, and thereafter did or attempted to promote or facilitate the promotion of such activity, in violation of 18 U.S.C. § 1952(a)(3) & (A).

h.      Using the mail or a facility in interstate or foreign commerce, including the internet and cellular phone networks, with intent to promote or facilitate the promotion of unlawful activity, namely, non-compact class III gaming at Grand Casino Mille Lacs, and thereafter did or attempted to promote or facilitate the promotion of such activity, in violation of 18 U.S.C. § 1952(a)(3) & (A).

i.      Using the mail or a facility in interstate or foreign commerce, including the internet and cellular phone networks, with intent to distribute the proceeds of an unlawful activity, namely, non-compact class III gaming at Grand Casino Hinckley, and thereafter did or attempted distribute the proceeds of such activity, in violation of 18 U.S.C. § 1952(a)(1) & (A);

j.      Using the mail or a facility in interstate or foreign commerce, including the internet and cellular phone networks, with intent to distribute the proceeds of an unlawful activity, namely, non-compact class III gaming at Grand Casino Mille Lacs, and thereafter did or attempted distribute the proceeds of such activity, in violation of 18 U.S.C. § 1952(a)(1) & (A).

157.    These acts of racketeering are related parts of a continuous, open-ended illegal-gambling scheme.  They are a regular way of conducting MLCV's and Grand Casinos' businesses at casinos that have routinely offered, and continue to routinely offer, illegal non-

compact class III card games.

158.   Running Aces has been injured in its businesses or property by reason of this

pattern of racketeering in conducting or participating in MLCV's and Grand Casinos' affairs.

### COUNT 2:
### Violations of 18 U.S.C. § 1962(d) based on conspiracy to violate 18 U.S.C. § 1962(c)
### with respect to MLCV and Grand Casinos by every ML Gaming Leader,
### ML Finance Leader, and ML Marketing Leader in their individual capacity

159.   Each ML Gaming Leader, ML Finance Leader, and ML Marketing Leader has

violated 18 U.S.C. § 1962(d) by conspiring among themselves to violate 18 U.S.C. § 1962(c) with

respect to MLCV and Grand Casinos.

160.   As alleged above, MLCV and Grand Casinos are enterprises engaged in, and whose

activities affect, interstate or foreign commerce.

161.   By virtue of being employed by or associated with MLCV or Grand Casinos, the

ML Gaming Leaders, ML Finance Leaders, and ML Marketing Leaders have agreed among

themselves to further the violations of 18 U.S.C. § 1962(c), including the racketeering acts, alleged

above.

162.   The acts of racketeering alleged above are overt acts committed in furtherance of

these conspiracies.

163.   Running Aces has been injured in its businesses or property by reason of those acts

of racketeering.

### COUNT 3:
### Violations of Minn. Stat. §§ 609.755, 609.76 subd. 1 by
### every ML Gaming Leader, ML Finance Leader, and
### ML Marketing Leader in their individual and official capacities

164.   Minnesota law makes it a crime to "make a bet"; "permit a structure or location

… to be used as a gambling place," i.e., "a location or structure … wherein … betting is

permitted or promoted"; "maintain or operate a gambling place"; and "intentionally participate in

the income of a gambling place."   Minn. Stat. §§ 609.75 subd. 5, 609.755, 609.76 subd. 1.

165.    Casino card games involve betting under Minnesota law.

166.    Grand Casino Hinckley and Grand Casino Mille Lacs are gambling places under Minnesota law.

167.    Minnesota criminal law and Minnesota gaming law apply to gaming activity on Indian lands that is not validly conducted pursuant to IGRA.   18 U.S.C. §§ 1162(a), 1166(a)-(b).

168.    The offering of class III card games other than blackjack at Grand Casino Hinckley and Grand Casino Mille Lacs is not exempt from Minnesota law pursuant to IGRA because it does not comply with the IGRA's requirements.   Specifically, the class III card games (other than blackjack) are not "conducted in conformance with a Tribal-state gaming compact entered into by the Indian tribe and the State … that is in effect."   25 U.S.C. § 2710(d)(1).

169.    Therefore, through their participation in the offering of class III card games other than blackjack at Grand Casino Hinckley and Grand Casino Mille Lacs, each ML Gaming Leader, ML Finance Leader, and ML Marketing Leader has committed one or more criminal offenses under Minn. Stat. §§ 609.755, 609.76 subd. 1.

170.    Absent this lawsuit, each ML Gaming Leader, ML Finance Leader, and ML Marketing Leader—by virtue of their employment responsibilities—would continue to commit such offenses in the future.

## COUNT 4:
### Violations of 18 U.S.C. § 1962(c) with respect to PI Commercial Enterprises and Treasure Island Resort & Casino by every PI Gaming Leader, PI Finance Leader, and PI Marketing Leader in their individual capacity

171.    Each PI Gaming Leader, PI Finance Leader, and PI Marketing Leader has violated 18 U.S.C. § 1962(c) with respect to PI Commercial Enterprises and Treasure Island Resort & Casino.

172.    PI Commercial Enterprises is an enterprise for RICO purposes: it is either a company or a long-established, ongoing organization functioning as an integrated unit for the overt purpose of furthering the Prairie Island's business ventures.

173.    Treasure Island Resort & Casino is an enterprise for RICO purposes: it is either a company or a long-established, ongoing organization functioning as an integrated unit for the overt purpose of furthering the Prairie Island's business ventures.

174.    PI Commercial Enterprises and Treasure Island Resort & Casino are enterprises engaged in, and its activities affect, interstate or foreign commerce.  For example:

 a.    PI Commercial Enterprises and Treasure Island Resort & Casino own and operate the second largest casino resort in Minnesota: Treasure Island Resort & Casino. Treasure Island solicits and attracts gaming patrons, travelers, and touring performers from other states and foreign countries.

 b.    Treasure Island is operated by PI Gaming Leaders, PI Finance Leaders, and PI Marketing Leaders through the use of interstate wires, including the internet and cellular phone networks.

175.    Each  PI Gaming Leader, PI Finance Leader, and PI Marketing Leader is employed by or associated with PI Commercial Enterprises and Treasure Island Resort & Casino and, by virtue of their related responsibilities, has conducted or participated in the conduct of the PI Commercial Enterprise's and Treasure Island Resort & Casino's affairs through at least two acts of racketeering within the last ten years that are related to each other and to those enterprises' gambling business:

 a.    Conducting, managing, supervising, or directing all or part of the illegal gambling business at Treasure Island Resort & Casino (relating to its non-compact class

III card games before October 4, 2023) in violation of 18 U.S.C. § 1955(a);

b.      Financing all or part of the illegal gambling business at Treasure Island

Resort & Casino (relating to its non-compact class III card games before October 4,

2023) in violation of 18 U.S.C. § 1955(a);

c.      Using the mail or a facility in interstate or foreign commerce, including

the internet and cellular phone networks, with intent to manage, establish, carry on, or

facilitate the management, establishment, or carrying on of unlawful activity, namely,

non-compact class III card games (before October 4, 2023) at Treasure Island Resort &

Casino, and thereafter did or attempted to manage, establish, carry on, or facilitate the

management, establishment, or carrying on of such activity, in violation of 18 U.S.C.

§ 1952(a)(3) & (A).

d.      Using the mail or a facility in interstate or foreign commerce, including

the internet and cellular phone networks, with intent to promote or facilitate the

promotion of unlawful activity, namely, non-compact class III card games (before

October 4, 2023) at Treasure Island Resort & Casino, and thereafter did or attempted to

promote or facilitate the promotion of such activity, in violation of 18 U.S.C.

§ 1952(a)(3) & (A).

e.      Using the mail or a facility in interstate or foreign commerce, including

the internet and cellular phone networks, with intent to distribute the proceeds of an

unlawful activity, namely, non-compact class III card games (before October 4, 2023) at

Treasure Island Resort & Casino, and thereafter did or attempted distribute the proceeds

of such activity, in violation of 18 U.S.C. § 1952(a)(1) & (A).

176.    These acts of racketeering are related parts of a continuous, open-ended illegal-

gambling scheme. They are a regular way of conducting the PI Commercial Enterprise's and Treasure Island Resort & Casino's businesses at their casino that has routinely offered illegal non-compact class III card games.

177. Running Aces has been injured in its businesses or property by reason of this pattern of racketeering in conducting or participating in the PI Commercial Enterprise's and Treasure Island Resort & Casino's affairs.

**COUNT 5:**
**Violations of 18 U.S.C. § 1962(d) based on conspiracy to violate 18 U.S.C. § 1962(c)**
**with respect to PI Commercial Enterprise and Treasure Island Resort**
**& Casino by every PI Gaming Leader, PI Finance Leader, and**
**PI Marketing Leader in their individual capacity**

178. Each PI Gaming Leader, PI Finance Leader, and PI Marketing Leader has violated 18 U.S.C. § 1962(d) by conspiring among themselves to violate 18 U.S.C. § 1962(c) with respect to PI Commercial Enterprise and Treasure Island Resort & Casino.

179. As alleged above, PI Commercial Enterprise and Treasure Island Resort & Casino are enterprises engaged in, and whose activities affect, interstate or foreign commerce.

180. By virtue of being employed by or associated with PI Commercial Enterprise and Treasure Island Resort & Casino, the PI Gaming Leaders, PI Finance Leaders, and PI Marketing Leaders have agreed among themselves to further the violations of 18 U.S.C. § 1962(c), including the racketeering acts, alleged above.

181. The acts of racketeering alleged above are overt acts committed in furtherance of these conspiracies.

182. Running Aces has been injured in its businesses or property by reason of those acts of racketeering.

## PRAYER FOR RELIEF

Therefore, Running Aces respectfully requests the following relief:

a.      A declaration that defendants' offering of non-compact class III card games has been illegal, and that, through such illegal activity and associated activities in violation of 18 U.S.C. § 1952(a) and 18 U.S.C. § 1955(a), defendants have violated 18 U.S.C. § 1962(c) and (d), in both their individual and official capacities.

b.      An award of treble damages against all defendants, jointly and severally, for the injuries to Running Aces' business or property caused by defendants' violations of 18 U.S.C. § 1962(c) and (d), in their individual capacity.

c.      An injunction against all defendants prohibiting them from illegally offering in the future any non-compact class III games in violation of Minnesota law and federal law, in both their individual and official capacities.

d.      Attorneys fees and costs.

e.      All other relief that the Court deems appropriate.

Respectfully Submitted,

Jesse Panuccio*
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
954-356-0011

Hamish P.M. Hume*
David M. Lehn*
William J. Harvey*
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
202-237-2727
hhume@bsfllp.com
dlehn@bsfllp.com
wharvey@bsfllp.com

/s/ Surya Saxena
_____
Surya Saxena
Chad A. Blumenfield
GREENE ESPEL PLLP
222 S. 9th St., Suite 2200
Minneapolis, MN 55402
612-373-8331
ssaxena@greeneespel.com
cblumenfield@greeneespel.com

April 16, 2024

* Motion for admission pro hac vice forthcoming

42

**APPENDIX OF EXHIBITS**
**TABLE OF CONTENTS**

Exhibit

Tribal-State Compact for Control of Class III Video Games of Chance
   on the Mille Lacs Band of Chippewa Reservation in Minnesota
      (effective June 29, 1990) .............................................................................................Ex. 1

Tribal-State Compact for Control of Class III Blackjack on the
   Mille Lacs Band of Chippewa Reservation in Minnesota
      (effective October 3, 1991) ..........................................................................................Ex. 2

Tribal-State Compact for Control of Class III Video Games of
   Chance on the Prairie Island Sioux Community Reservation
   in Minnesota
      (effective April 2, 1990) …..........................................................................................Ex. 3

First Amendment to Technical Standards in Tribal-State Compact
   for Control of Class III Video Games of Chance on the
   Prairie Island Sioux Community Reservation in Minnesota
      (effective April 30, 1991) ............................................................................................Ex.4

Tribal-State Compact for Control of Class III Blackjack on the
   Prairie Island Community Reservation in Minnesota
      (effective October 3, 1991) ..........................................................................................Ex.5

Addendum to Tribal-State Compact for Control of Class III
   Blackjack on the Prairie Island Indian Community
   Reservation Minnesota for Class III Card Games
      (effective October 4, 2023) ..........................................................................................Ex.6