UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| NORTH METRO HARNESS INITIATIVE LLC, d/b/a Running Aces, | Case No. 24-CV-1369 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| MICHAEL BEATTIE, in his individual and official capacities, et al., | |
| Defendants. | |

David M. Lehn, Hamish P.M. Hume, William J. Harvey, BOIES SCHILLER FLEXNER LLP; Surya Saxena, Chad A. Blumenfield, Erin Emory, GREENE ESPEL PLLP, for plaintiff.

Joshua T. Peterson, Allison J. Mitchell, FAEGRE DRINKER BIDDLE & REATH LLP, for defendants Michael Beattie, Craig Beaulieu, Leana DeJesus, Dustin Goslin, Scott Hanson, Ryan McGrath, Joe Nayquonabe, Jr., Lon O'Donnell, Shawn O'Keefe, Dayna Pearson, Robert Sawyer, Les Schmolke, and Ronda Weizenegger.

James K. Nichols, Joseph F. Halloran, THE JACOBSON LAW GROUP; John C. Ekman, Archana Nath, Natalie I. Uhlemann, Claire Colby McVan, FOX ROTHSCHILD LLP, for defendants Shelley Buck, Constance Campbell, Michael Childs, Jr., Michael Heavner, Michael Jankoviak, Grant Johnson, Johnny Johnson, Ronald Johnson, Kevin McNair, and Valentina Mgeni.

Greg S. Paulson, Philip Brodeen, BRODEEN & PAULSON P.L.L.P., for defendants Keith Anderson, Lori Colling, Ashley Cornforth, Rebecca Crooks-Stratton, Don Damond, Lee Dillard, Alison Fogarty, Angela Heikes, Tim Genia, Noah Hirsch, Kyle Kossol, Cole Miller, Kyle Peterson, Sam Rook, Charles Vig, and Dennis Walker.

Plaintiff North Metro Harness Initiative LLC, d/b/a Running Aces ("Running Aces"), operates an entertainment complex, which includes a casino, a racetrack, and a restaurant. Running Aces alleges that five tribal casinos in Minnesota—Treasure Island Resort & Casino, Grand Casino Hinckley, Grand Casino Mille Lacs, Mystic Lake, and Little Six—are offering (or have offered) certain types of illegal gaming. Each of these casinos is owned and operated by a federally recognized Tribe: the Prairie Island Indian Community ("PIIC") (Treasure Island Resort & Casino); the Mille Lacs Band of Ojibwe, through its economic-development corporation, Mille Lacs Corporate Ventures ("MLCV") (Grand Casino Hinckley and Grand Casino Mille Lacs); and the Shakopee Mdewakanton Sioux Community ("SMSC") (Mystic Lake and Little Six).[1]

Running Aces did not sue the Tribes, however, presumably because the Tribes are immune from suit. Instead, Running Aces named 39 current and former employees and officials associated with the casinos in both their individual and official capacities. Running Aces seeks declaratory and injunctive relief as well as treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d), for the financial harm that the Tribes have caused to Running Aces by offering the illegal forms of gaming at their casinos.

---

[1]The Mille Lacs Band of Ojibwe is a band, or affiliate, of the Minnesota Chippewa, which is a federally recognized tribe. Am. Compl. ¶ 122. For ease of reference, the Court will refer to the PIIC, the Mille Lacs Band, and the SMSC collectively as the "Tribes."

This matter is before the Court on defendants' motions to dismiss for numerous reasons. The Court held a day-long hearing on the motions on February 13, 2025. For the reasons that follow, the Court grants the motions to dismiss under Fed. R. Civ. P. 12(b)(7) for failure to join a required party. Specifically, the Court agrees with defendants that, under Fed. R. Civ. P. 19, the Tribes are required parties that cannot be joined and in whose absence the case should be dismissed.

## I. BACKGROUND

### A. *Legal Background*

In 1987, the Supreme Court held that states could not regulate gaming on tribal land absent Congressional authorization. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). In response, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 et seq., "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(1), (3). It is difficult to overstate the importance of gaming to tribes. "Congress has noted that for tribes, gaming income 'often means the difference between an adequate governmental program and a skeletal program that is totally dependent on Federal funding.'" *City of*

*Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 785 F.3d 1207, 1211 (8th Cir. 2015) (citation omitted).

To accomplish its goals, IGRA "creates a framework for regulating gaming activity on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014). IGRA divides games into three classes. Class I and II games include social games for minimal prizes, traditional Indian games, and bingo. 25 U.S.C. § 2703(6)–(7). Class III games, which are the only type at issue here, include everything else, such as slot machines, casino games, and house-banking card games.[2] *Id.* § 2703(8); 25 C.F.R. § 502.4.

Class III games may be legally operated on tribal land if three requirements are met: (1) the gaming is "located in a State that permits such gaming for any purpose by any person, organization, or entity"; (2) the state and tribe have entered into a compact that permits such gaming; and (3) the tribe has adopted an ordinance that permits such gaming. 25 U.S.C. § 2710(d)(1). A compact takes effect when the U.S. Department of the Interior ("DOI") publishes a notice of approval of the compact in the Federal Register. *Id.* § 2710(d)(3)(B).

---

[2]"House banking game means any game of chance that is played with the house as a participant in the game, where the house takes on all players, collects from all losers, and pays all winners, and the house can win." 25 C.F.R. § 502.11. House banking games include "[c]ard games such as baccarat, chemin de fer, blackjack (21), and pai gow (if played as house banking games)." 25 C.F.R. § 502.4(a)(1).

*B. The Tribes' Gaming Operations*

1. The PIIC (Treasure Island)

Treasure Island Resort & Casino ("Treasure Island") opened in 1991. Am. Compl. ¶ 180. It operates 24 hours per day, 365 days per year. Am. Compl. ¶ 180. It is Minnesota's second largest casino and includes the state's second-largest hotel along with numerous amenities, including restaurants, bars, a water park, a spa, a convention center, an amphitheater, a marina, an RV park, a yacht, a bowling alley, and entertainment from nationally known performers. Am. Compl. ¶ 180. Treasure Island hosts hundreds of thousands of customers annually and generates hundreds of millions of dollars in annual revenue. Am. Compl. ¶ 181.

As noted, before a tribe can offer Class III games, IGRA requires, among other things, that the state and the tribe enter into a compact that permits such gaming. In 1990, the PIIC entered into a compact with Minnesota that allows the tribe to offer Class III video games of chance ("VGC"). Am. Compl. ¶ 196. In 1991, the PIIC and Minnesota entered into a second compact that allows the tribe to offer blackjack, which is a Class III card game. Am. Compl. ¶ 198. In October 2023, DOI published notice of its approval of an amendment to the blackjack compact that permits the PIIC to offer all Class III banking card games. Am. Compl. ¶ 202.

2.  MLCV (Grand Casino Hinckley and Grand Casino Mill Lacs)

Grand Casino Hinckley and Grand Casino Mille Lacs opened in the early 1990s. Am. Compl. ¶ 127.  They are two of the largest entertainment destinations in Minnesota.  Am. Compl. ¶ 127.  Both of them operate 24 hours per day, 365 days per year, and together the two casinos host hundreds of thousands of customers annually and generate hundreds of millions of dollars in annual revenue.  Am. Compl. ¶ 127. Grand Casino Hinckley offers what may be the largest lodging complex in Minnesota as well as numerous amenities, including restaurants, a golf course, an amphitheater, a spa, and an arcade, as well as live entertainment.  Am. Compl. ¶ 128.  Grand Casino Mille Lacs similarly offers amenities such as a large hotel, a museum, a movie theater, and a concert venue.  Am. Compl. ¶ 129.

In 1990, the Mille Lacs Band entered into a compact with Minnesota that allows the Band to operate VGC.  Am. Compl. ¶ 139.  In 1991, the Band entered into a second compact with Minnesota that allows it to offer blackjack.  Am. Compl. ¶ 141.  In August 2024, DOI published notice of its approval of an amendment to the blackjack compact to permit the operation of all Class III banking card games.  *See* Approval of Gaming Compact, 89 Fed. Reg. 67,958 (Dep't of Interior Aug. 22, 2024); Peterson Decl. [ECF No. 40] Ex. A.

3. The SMSC (Mystic Lake and Little Six)

Mystic Lake, which opened in 1992, is Minnesota's largest casino and entertainment complex. Am. Compl. ¶¶ 76–77. It includes one of the largest hotels in Minnesota as well as restaurants, an event center, a golf course, a spa, and various entertainment venues. Am. Compl. ¶ 77. Both Mystic Lake and Little Six (which opened in 1987) operate 24 hours per day, 365 days per year, and together the two casinos host hundreds of thousands of customers annually and generate hundreds of millions of dollars in annual revenue.[3]  Am. Compl. ¶ 76.

4. Allegedly Illegal Gaming

Running Aces alleges that all five casinos are illegally offering VGC. Am. Compl. ¶¶ 98–100, 110–12, 149–51; 164–65; 207–09. Although the Tribes' compacts have long permitted VGC, Running Aces contends that VGC is illegal under Minnesota law. As a result, says Running Aces, the casinos run afoul of the IGRA requirement that the VGC be "located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B).

---

[3]Running Aces includes allegations about the SMSC's gaming compacts, which, like the other tribes' compacts, permitted only VGC and blackjack until the blackjack compact was amended in March 2024 to allow other Class III banking card games. Am. Compl. ¶¶ 89–94. But Running Aces does not allege that any aspect of the SMSC's gaming operations failed to comply with its compacts.

Running Aces further alleges that, prior to the recent amendment of their blackjack compacts, the PIIC (at Treasure Island) and MLCV (at the two Grand Casinos) acted illegally in offering Class III card games other than blackjack because such games were not permitted by the Tribes' compacts. *See id.* § 2710(d)(1)(C) (requiring that gaming be "conducted in conformance with a Tribal-State compact . . . that is in effect"). Am. Compl. ¶¶ 152–153, 166-67, 210–11.

Running Aces divides defendants into three groups according to the tribal affiliation of the casino for which each defendant works (or worked) and brings three claims against each of the three groups: (1) claims that defendants have violated Minnesota law by offering VGC and (with respect to the PIIC and MLCV defendants) non-blackjack Class III card games (Counts 1, 4, and 7); (2) claims for substantive violations of RICO, 18 U.S.C. § 1962(c) (Counts 2, 5, and 8); and (3) RICO-conspiracy claims (Counts 3, 6, and 9). Running Aces seeks (1) a declaration that defendants' offering of VGC and non-compact Class III card games was illegal and that defendants violated RICO; (2) an injunction prohibiting defendants from illegally offering any VGC in the future,[4] and (3) treble damages under RICO. Running Aces seeks damages

---

[4]Although Running Aces originally sought prospective relief with respect to the allegedly illegal Class III card games, Running Aces states in its brief that it no longer seeks such relief in light of the amendments to the relevant blackjack compacts. Plf.'s Mem. 11 [ECF No. 62].

against defendants in their individual capacities only; it seeks injunctive and declaratory relief against defendants in both their individual and official capacities.

## II.  ANALYSIS

### A.  Standard of Review

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(7) for failure to join a party under Fed. R. Civ. P. 19.  Specifically, defendants claim that the Tribes are required parties in whose absence the case cannot proceed.

When deciding whether to grant a Rule 12(b)(7) motion, a court must follow a three-step process:  First, the court must determine whether an absent party is "required" under Rule 19(a).  Second, if so, the court must determine whether joinder of the required party is feasible.  And third, if not, the court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).  In making these determinations, a court may consider matters outside of the pleadings.  *See Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 480 n.4 (7th Cir. 2001).

### B.  Rule 19(a)

A person is a "required party" under Rule 19(a) if, among other things, "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or

impede the person's ability to protect the interest."  Running Aces admits that each Tribe claims an interest relating to the subject of this action.  Running Aces could hardly argue otherwise, as it is the Tribes (not the defendants) who have the exclusive right to conduct gaming on their lands, the Tribes (not the defendants) who are parties to the relevant compacts under which gaming is conducted, and the Tribes (not the defendants) who are the intended beneficiaries of Congress's decision to permit gaming on tribal lands.  All of these interests are at stake in this litigation.  25 U.S.C. § 2701(4), (5); *id.* § 2702; *id.* § 2710(d).

Running Aces argues, however, that the Tribes' interests are adequately represented by the existing defendants because this is an *Ex parte Young* action in which defendants, in their official capacities, are essentially standing in for the Tribes.  *See Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929–30 (D.C. Cir. 2012) (reversing dismissal for failure to join tribe because "as a practical matter . . . the Cherokee Nation and the Principal Chief in his official capacity are one and the same in an *Ex parte Young* suit for declaratory and injunctive relief" and therefore "the Principal Chief can adequately represent the Cherokee Nation").

The Court disagrees, as this case differs significantly from a typical *Ex parte Young* action.  *Cf. id.* at 930 (noting that the case was indistinguishable from "a run-of-the-mill *Ex parte Young* action"); *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d

1176, 1177 (9th Cir. 2012) (reversing Rule 12(b)(7) dismissal because the case involved "a routine application of *Ex parte Young*").  In a typical *Ex parte Young* case, the plaintiff challenges an allegedly unconstitutional state law, and the plaintiff seeks only declaratory and injunctive relief to prevent the state from enforcing that law.  Further, an *Ex parte Young* action is (indeed must be) brought against an official who has the authority to enforce the challenged law.  *See Ex parte Young*, 209 U.S. 123, 157 (1908).  Typically, for example, an *Ex parte Young* action is brought against a state official (such as a governor or attorney general) who is charged in a state constitution or statute with enforcing the laws of the state—and, as noted, the plaintiff seeks only to block the official from enforcing one of the state's laws.

In short, in a typical *Ex parte Young* action, the interests of the official who is sued (in his or her official capacity) fully align with the interests of the absent state.  Indeed, everyone knows that the official-capacity claim against the official is "really against the state."  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 267 (2011) (Roberts, C.J., dissenting) ("As we have often observed, *Ex parte Young* rests on the 'obvious fiction' that such a suit is not really against the State, but rather against an individual who has been 'stripped of his official or representative character' because of his unlawful conduct." (citations omitted)).  That is why the Supreme Court has candidly acknowledged—for decades—that *Ex Parte Young* is a "fiction."  *See id.*, 563 U.S. at 255

-11-

("[*Ex Parte Young*] rests on the premise—less delicately called a "fiction"—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." (citation omitted)).

Here, by contrast, Running Aces has not brought an official-capacity claim against the equivalent of a governor or attorney general seeking merely to enjoin the enforcement against Running Aces of an allegedly unconstitutional law. Instead, Running Aces—a bitter competitor of the Tribes—is seeking to impose crushing personal financial liability under RICO on dozens of current and former employees of the casinos. *See Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1307 (8th Cir. 1997) (noting that "the remedies available under RICO are among the most severe ever enacted in a federal civil statute" (citation omitted)). The personal interests of these employees in avoiding financial ruin obviously places them on a significantly different footing from that of an elected or appointed official, who is charged with enforcing a challenged law, and who faces no prospect of personal liability.

Running Aces nevertheless contends that, because establishing the legality of the challenged games would defeat RICO liability, defendants share the same interest in defending this case as do the Tribes. But RICO is a notoriously complex statute, and there are many ways to defend a RICO claim that have nothing to do with the legality of the alleged predicate acts—here, the legality of the allegedly illegal gaming offered

by the Tribes. *See United States v. Anderson*, 626 F.2d 1358, 1365 (8th Cir. 1980) ("The RICO language is particularly complicated, and the various elements of the offense intricately interrelate."). Particularly given the threat of personal liability for treble damages, the RICO claims are likely to have an outsized impact on defendants' litigation strategy.

Similarly, the threat of personal RICO liability significantly alters the settlement incentives in this case.[5] One can easily imagine, say, the marketing director or finance director of a tribal casino—someone who likely never expected to be put in the position of defending the legality of particular games offered by the tribe—deciding that

---

[5]At oral argument, Running Aces contended that this is not a proper consideration under Rule 19. As discussed below, however, Rule 19(b) calls for a practical inquiry that is highly dependent on the particular facts of the case, and "[t]he inquiry as to prejudice under Rule 19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action will impair the absent party's ability to protect its interest." *Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1497 n.9 (D.C. Cir. 1995); *see also Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1291 (10th Cir. 2003) (same).

As a practical matter, a party subject to significant financial pressure to settle a case in a manner adverse to—or at least without regard to the interests of—an absent party has a conflict of interest with the absent party, and a conflict of interest is indisputably a proper factor for a court to consider when deciding whether an existing party can adequately represent the interests of an absent party. *See S.D. ex rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785–86 (8th Cir. 2003) ("The Tribe can rebut the presumption that the government is adequately representing its interests by showing that its interests actually differ from or conflict with the government's interests."); *cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("The adequacy inquiry under [Fed. R. Civ. P.] 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.").

consenting to declaratory and injunctive relief in exchange for relief from the threat of treble damages under RICO is a great deal. This factor is magnified by the presence of so many disparate defendants, some of whom are *former* employees whose *only* exposure is to money damages.

Moreover, Running Aces's challenges to the PIIC's and MLCV's card games are not *Ex parte Young* claims at all, as Running Aces is no longer seeking any prospective relief as to those claims. Defendants' interest in avoiding personal RICO liability is the sole practical interest at stake among the current parties as to the card-game claims, yet those claims turn entirely on interpretations of the relevant tribal compacts—compacts to which no defendant is a party.

Finally, it is worth noting that the nature of the Tribes' interest here is different in kind from the nature of a state's interest in a typical *Ex parte Young* action. Although a state's sovereign interest in the validity and enforcement of its own laws is obviously significant, enjoining the enforcement of a given state law does not, in a typical case, threaten the financial stability of the state. Here, by contrast, the Tribes assert—and Running Aces does not seem to dispute—that the challenged gaming provides much of the income received by the Tribes. That income is crucial to the Tribes' economic self-sufficiency and a critical source of jobs for Tribal members.

In sum, this is not an ordinary *Ex parte Young* case—and, as to the card-game claims, this is not an *Ex parte Young* case at all.  As is true in an ordinary *Ex parte Young* case, the sovereign (i.e., each Tribe) "claims an interest relating to the subject of the action."  Fed. R. Civ. P. 19(a)(1)(B).  But as is *not* true in an ordinary *Ex parte Young* case, the sovereign is "so situated that disposing of the action in the [sovereign's] absence may . . . as a practical matter impair or impede the [sovereign's] ability to protect the interest."  Fed. R. Civ. P. 19(a)(1)(B)(i).  Because the existing defendants' interests materially diverge from those of the Tribes, the Tribes' absence puts the Tribes at significant risk of significant harm.

## C.  Rule 19(b)

There is no dispute that the Tribes cannot be joined because they are protected by sovereign immunity.  *See Bay Mills Indian Cmty.*, 572 U.S. at 788 (explaining that Indian tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers" (citation and quotation marks omitted)).  The Court therefore must determine whether, in "equity and good conscience," the case should proceed or be dismissed.  Fed. R. Civ. P. 19(b).

Rule 19(b) identifies several non-exclusive factors to help guide this inquiry, including (1) the extent to which a judgment might prejudice the absent party or existing parties; (2) whether such prejudice could be lessened or avoided by protective

provisions, shaping the relief, or other measures; (3) whether a judgment would be adequate; and (4) whether the plaintiff would have an adequate alternative remedy in the case of dismissal. *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 862 (2008) (factors listed in Rule 19(b) are not exclusive). "[T]he determination whether to proceed will turn upon factors that are case specific, which is consistent with a Rule based on equitable considerations." *Id.* at 862–63; *see also Fort Yates Pub. Sch. Dist. No. 4 v. Murphy ex rel. C.M.B.*, 786 F.3d 662, 671 (8th Cir. 2015) (describing the Rule 19 inquiry as "a highly-practical, fact-based endeavor" (citation omitted)); *Two Shields v. Wilkinson*, 790 F.3d 791, 798 (8th Cir. 2015) ("The Rule 19 inquiry is a context sensitive one which may vary from case to case.").

Applying the Rule 19(b) factors, the Court finds that they weigh in favor of dismissal. With respect to prejudice, the Court has already concluded that the Tribes' absence puts them at risk of potentially devastating harm, as a critical source of income could be declared illegal and many of their key positions could be enjoined from offering or promoting the challenged games. *See Kickapoo Tribe*, 43 F.3d at 1497 n.9 (explaining that the Rule 19(a) inquiry regarding the absent party's ability to protect its interest mirrors the Rule 19(b) inquiry regarding prejudice). In addition, the Supreme Court has made clear that, when considering prejudice under Rule 19(b), an absent party's immunity from suit should be given a great deal of weight. *See Pimentel*, 553

U.S. at 864–67. Nor is there any way to avoid such prejudice. For Running Aces to prevail on any of its claims, the Court or a jury must first find that the Tribes acted unlawfully in offering VGC and the challenged Class III card games, and that finding could cripple the Tribes financially and cost the jobs of hundreds of tribal members.

With respect to whether a judgment would be adequate: Given the Tribes' significant interest in the income generated by VGC—and given that it is the Tribes, and not defendants, who have the right to conduct gaming on tribal land—the failure of any injunctive and declaratory relief to bind the Tribes means that any judgment may not be adequate. *See id.* at 870 (explaining that adequacy under Rule 19(b) does not refer to the satisfaction of the plaintiff's claims, but rather to the public's interest in "the efficient administration of justice and the avoidance of multiple litigation" (citation omitted)). Running Aces emphasizes that, if it succeeds on its official-capacity claims, the resulting injunction will bind the *office*, and not the particular human being who now holds the office. But it is not clear which, if any, of the "offices" that have been sued have authority to altogether preclude the Tribes from offering VGC. And even if one of those "offices" has such authority, it is not clear to what extent the employing Tribe (which is not a party and thus not bound by any judgment) could simply abolish the enjoined office and move the authority to a non-enjoined office (perhaps even a new office created for this purpose).

As to the final factor, whether the plaintiff has an adequate alternative remedy: To begin with, the Court notes that it harbors doubts about Running Ace's claims, as the state-law claims appear to be preempted, and the RICO claims appear to be precluded by the carefully balanced remedial scheme of IGRA. *See In re Sac & Fox Tribe Casino Litig.*, 340 F.3d 749, 766 (8th Cir. 2003) (IGRA provides no general private right of action, although it permits a state or an Indian tribe to sue to enjoin illegal gaming); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 550 (8th Cir. 1996) ("Those causes of action which would interfere with the nation's ability to govern gaming should fall within the scope of IGRA's preemption of state law."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) (holding that a tribe could not use *Ex parte Young* to enforce IGRA's requirement that states negotiate in good faith because "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*"); *Ass'n for Gov't Accountability v. Simon*, No. 24-1410, 2025 WL 518027, at *1 (8th Cir. Feb. 18, 2025) (concluding that the "detailed remedial scheme" of the Driver's Privacy Protection Act, which gives the Attorney General enforcement power against states, precluded an *Ex parte Young* action to enforce the Act); *cf. Doe*, 107 F.3d at 1308 (concluding that RICO claims premised on violations of Minnesota insurance law were barred by the McCarran-Ferguson Act

because "the extraordinary remedies of RICO would frustrate, and perhaps even supplant, Minnesota's carefully developed scheme of regulation").

Setting that aside, even if Running Aces's claims have merit, the remaining Rule 19(b) factors—especially the Tribes' sovereign immunity and the magnitude of the prejudice that the Tribes could suffer from a judgment entered in this case—weigh in favor of dismissal. Indeed, courts frequently find that an absent tribe's sovereign immunity outweighs the plaintiff's lack of an alternative forum. *See In re U.S. ex rel. Hall*, 825 F. Supp. 1422, 1430 (D. Minn. 1993) ("[W]here a necessary party is immune from suit, there may be 'very little room for balancing of other factors' because immunity may be considered a compelling interest." (citation omitted)), *aff'd sub nom. U.S. ex rel. Hall v. Creative Games Tech., Inc.*, 27 F.3d 572 (8th Cir. 1994) (per curiam); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1025 (9th Cir. 2002) ("[W]e have regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs."); *Davis ex rel. Davis*, 343 F.3d at 1293–94 ("[T]he plaintiff's inability to obtain relief in an alternative forum is not as weighty a factor when the source of that inability is a public policy that immunizes the absent person from suit."); *Kickapoo Tribe*, 43 F.3d at 1496 ("'[T]here is very little room for balancing of other factors' set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit

because immunity may be viewed as one of those interests 'compelling by themselves.'" (citation omitted)).

As noted, the gaming that is challenged in this lawsuit is of enormous economic importance to the absent Tribes, and protecting the economic sustainability of tribes is a primary goal of IGRA specifically and federal Indian policy generally.  See 25 U.S.C. §§ 2701–02.  The Court therefore has little trouble concluding that the Tribes' interests in protecting a critical source of funds and jobs outweigh Running Aces's interest in a forum for its claims of competitive injury.

For these reasons, defendants' motion to dismiss under Rule 12(b)(7) is granted.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motions to dismiss [ECF Nos. 27, 32, 37] are GRANTED insofar as they seek dismissal under Fed. R. Civ. P. 12(b)(7).

2. Plaintiff's amended complaint [ECF No. 12] is DISMISSED WITHOUT PREJUDICE for failure to join a required party.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 11, 2025

_____
Patrick J. Schiltz, Chief Judge
United States District Court